be rendered therein, and each party must pay his own costs.

It is therefore ordered that the appeals herein taken be dismissed.

---

(41 South. 431.)

No. 15,690.

PAYNE & JOUBERT v. BOWIE LUMBER CO., Limited.

(June 4, 1906.)

1. SALE — GUARANTY — COMPLIANCE WITH TERMS.

Where a mechanical apparatus is guarantied, on a certain condition, the condition must be complied with in order to enforce the guaranty.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, §§ 793–796.]

2. SAME—ACTION FOR PRICE—DEFENSES.

When the contractee has operated a mechanical plant long enough to test it, and has made specific demands, all of which have been complied with, and has finally expressed a willingness to settle the account of the contractor, provided the latter complies with a demand arising out of another transaction, with different parties, objections, urged on the trial of the suit for the price of the plant, that it had not been completed according to contract, are not entitled to favorable consideration.

(Syllabus by the Court.)

Appeal from Twentieth Judicial District Court, Parish of Lafourche; Louis P. Caillouet, Judge.

Action by Payne & Joubert against the Bowie Lumber Company, Limited. Judgment for plaintiffs, and defendant appeals. Affirmed.

Howell & Martin, for appellant. Henry Laurence Lazarus, for appellees.

MONROE, J. Plaintiff sues for a balance of $1,937.01, alleged to be due on a contract for the erection of four steam kilns, for drying lumber, and for a balance of $781.60, due on open account for merchandise sold. Defendant admits that it owes the balance claimed on open account, but denies that the contract sued on has been executed, and, by

way of reconvention, sets up a claim for damages, to the amount of $2,808.40, alleged to have been sustained by reason of its non-execution.

The facts, as we find them from the record, are as follows:

In October, 1901, the parties hereto entered into a contract, containing, among others, the following stipulations, to wit:

"Payne & Joubert * * * agree with the Bowie Lumber Company, Limited., to furnish them four Globe steam kilns, of the circulating system, * * * to be as per specifications appended below, * * * to furnish all the iron-work necessary to make the kilns complete, on the inside, of the best material and workmanship. * * * The apparatus to consist of headers, corrugated pipe rests, trucks No. 2 [and here follow further details]; to make the kilns complete, on the inside, in first class workmanship manner. * * * It is understood that Payne & Joubert will furnish the Bowie Lumber Company, Limited, a competent man to superintend putting up the apparatus, at $3 a day, railroad fare, to, and from, New Orleans, and board, if they should want a man to superintend putting up said apparatus. It is further understood that Payne & Joubert will furnish competent pipe fitters, to install the apparatus in the buildings, at the regular price of pipe fitters per day, their board and railroad fare, * * * final payment to be made on these kilns after same have been fully constructed, tested and in working order. * * * It is agreed * * * that, if any items are not enumerated in the above-written contract which are necessary to the full operation of the above-named apparatus of these kilns, * * * the parties, of the first part [Payne & Joubert] are to supply the same at their cost. * * *

"Guaranty: Payne & Joubert guaranty these kilns to dry as much one-inch cypress lumber in twenty four hours as any other kilns constructed on the circulating plan. It is understood that the Bowie Lumber Company, Limited, is to carry the temperature and operate the kilns as Payne & Joubert or their representative may direct, and to carry 80 pounds of steam pressure on the kilns."

The kilns were assumed to be in working order, and the defendant began operating them in February, 1902 (probably before the middle of the month), and, on February 21st, plaintiff wrote to defendant's representative; in part, as follows:

"What is the status of our contract with you, now, on the new kiln which you have lately started up? Have you tested it sufficient-

ly to your satisfaction so that we may collect the outstanding indebtedness on the same?"

To this, defendant, through Mr. Wigginton, its secretary-treasurer and manager, replied:

"We have not tested the kilns sufficiently as yet to know if they will give satisfaction, but expect to make some little changes which will have the effect of getting better service out of them, and we think, by the end of next week, we will be in a position to give you a decisive answer. The writer expects to see Mr. Downman [the president of the company] within the next few days and talk the matter over with him and endeavor to reach some conclusion at an early date, so that we will be in a position to make you a final settlement after proper deductions have been made, for freight allowance to Bowie, faultily constructed track, lighter rails than contract called for, missing fish plates and bolts, and iron washers for outside of building, instead of wooden ones as put in by your men."

Letters were then exchanged, on February 24th and 26th, in which each of the parties expressed the belief that a pleasant settlement "would soon be effected." Thereafter, it appears that the defendant become dissatisfied with the valves which controlled the steam pressure (and the temperature) at the kilns, and the plaintiff agreed to supply others, and, on April 7th, plaintiff wrote:

"We have your favor of the 4th, containing information regarding * * * valves, for which we thank you. It is our intention to forward your letter to the factory in substantiation of the claim which we have put in that they should take them back. Referring to the * * * valves which we agreed to furnish you in place of these, we beg to advise that they were shipped from the factory * * * on March 28th, and we expect to receive them daily. * * * We believe that, after you will have received these new valves, we will have satisfied every claim that you have made on us previous to the settling of your account. We therefore inclose a complete statement of your account, as it now stands on our books, with credit memoranda covering every item as specified by your Mr. Wigginton to our Mr. Joubert. The inclosed credits are as follows [here follow a number of credits, and statement of balance due—$2,720.39, after which, the writer proceeds]. We believe that the balance which is obtained, after allowing all your claims, is due in accordance with your books; the only amount in dispute being an item of $164 for curtain doors, which matter we will take up, direct, with Mr. Downman."

To this letter, defendant replied next day (April 8th):

"Yours of the 7th received with inclosed credit memoranda, which we find to be correct, as per the memorandum given your Mr. Joubert in New Orleans. We are glad to know that you expect to ship the * * * valves to us shortly, as the ones we have on now are certainly giving us a great deal of trouble, to say nothing of the damage that has been caused to our stock on account of their defective working. With this valve matter settled, we believe the only question between us is the matter of curtain doors, and, as you say in your letter you will take it up with Mr. Downman, direct, we will await his instructions before sending you check to cover balance. I will take this matter up with Mr. Downman as requested."

The valves referred to in this correspondence were duly furnished, and no question as to their sufficiency is raised in this suit. The curtain doors were doors to be made of canvass and covered with asbestos, which defendant wanted (instead of doors of some other material) for the openings in the kiln buildings; but, as plaintiff's contract required them to furnish only that which was necessary to make the kilns complete "on the inside," they were under no obligation to furnish them. It was, perhaps, after the letter last above quoted was written that a conference took place, in the office of Mr. Downman, at which were present Messrs. Downman, Wigginton, Graham, Dallas, Joubert, and De Pass. Downman and Dallas occupied, respectively, the same relations to the Iberia Cypress Company, Limited, as Downman and Wigginton occupied to the defendant company. Graham was in defendant's employ. Joubert is one of the plaintiffs, and De Pass was and is plaintiffs' engineer, under whose directions the kilns here in question, as also a kiln for the Iberia Cypress Company, Limited, had been put up, and, whilst one of the purposes of the conference, no doubt, was to discuss the business between plaintiffs and defendant (otherwise Wigginton's presence would have been superfluous), it is, nevertheless, a fact that the burning question of the moment was the business between plaintiffs and the Iberia Company. Joubert and De Pass testify that

Downman and Wigginton expressed themselves as pretty well satisfied with the Bowie kilns, and that Downman admitted, in effect, that they had not been properly operated. Downman and Wigginton deny the expressions and admissions attributed to them, and say that the purpose of the meeting was to make some arrangement "about getting these kilns adjusted and working properly." Downman says, in his testimony:

"I may have made the statement that the kilns could be made all right, but I never gave any expression or idea that the kilns were all right or satisfactory."

Wigginton says:

"They were after us for a settlement. Mr. Joubert and myself, a few days previous to that, had gotten together and fixed up our accounts, as far as our books agreed together, and I told him that the kilns were not giving us proper results, and Mr. De Pass arranged to go out there and see if something could not be done to relieve the situation; so that, a few days after, he did go out to Bowie and took some measurements there to put ventilators in the dry ends of the kilns, thinking that would make them work properly. It was my impression, at the time, that the moist air was hanging around the dry ends of the kilns, having no outlet to it, thereby absorbing itself into the lumber instead of escaping out of the buildings. Q. Well, did you at that meeting express satisfaction with the working of these kilns? A. No, sir."

Dallas testifies that he stated his troubles (with the Iberia kiln), and that Wigginton stated his (with the Bowie kilns), and that he does not remember that either Wigginton or Downman expressed satisfaction, or that either of them said that the Bowie kilns dried one-inch lumber satisfactorily. Graham, the only other person who was present, appears not to have been within reach, and was not examined as a witness. It is a fact beyond dispute that plaintiffs did put ventilators in the dry ends of the kilns shortly after this conference, a fact which indicates, upon the one hand, that the kilns had not been absolutely accepted, as the result of the conference, and, upon the other, that Wigginton, at least, must have found the cause of complaint, whatever it may have been that

was suggested by him, after writing the letter of April 8th, since, in that letter, he states distinctly that the matter of the valves being arranged there was nothing between plaintiffs and the settlement of the balance of their account, save the question of the "curtain door." It seems to us, therefore, that the idea of the conference was that, whilst the Bowie kilns were fairly up to the requirements of the contract, it was thought advisable that plaintiffs should examine them and give them a finishing touch, and that this idea subsequently materialized in the form of additional ventilators; and this view of the matter is confirmed by two circumstances, viz.: (1) That, as a fact, there had never been a uniform pressure of 80 pounds of steam maintained upon the pipes in the kiln, which pressure was required as a condition of plaintiffs' guaranty (the evidence showing that the pressure varied from 100 to 30 pounds, during each period of 24 hours); and (2) that on April 26th (after the conference, and, as we infer, after the ventilators were put in), Mr. Downman, as president of the Iberia Cypress Company, Limited, wrote plaintiffs as follows, to wit:

"Referring to contract which your firm made with us to put up kilns and lumber stacks at our mill located in New Iberia, La., I beg to now make demand upon you for the sum of $3,000 to cover the loss of time, expense, and damage done us by the insufficiency of the work put in by you, and the unnecessary and extraordinary delays caused by your dilatory methods of doing business. I would like for you to hand me your check for above amount, and *we will come to a speedy settlement of any account that may be due you, there or elsewhere, by our companies.*" (Italics by the court).

It appears, therefore, that, as a last word, the defendant was withholding settlement of the claim for putting up the Bowie kilns as a club, or lever, with which to force a satisfactory settlement of the difference between plaintiffs and the Iberia Company with regard to kilns and stackers contracted for with that concern. It is true that there has been a great deal of complaint (from

defendant's customers) about the condition of the lumber turned out by its kilns, but, as it is conceded that the kilns have never been operated in accordance with the terms of plaintiffs' guaranty, we must presume that the trouble lies in the method of operating them rather than in the kilns themselves. It is also true that the engineer, who has charge of the engines which supply the steam for the kilns, testifies that, with 100 pounds pressure, he is unable to obtain the proper temperature in kiln No. 1.

But we find it remarkable that, in that state of affairs, defendant, after operating the kilns for two months, or more, should not have mentioned that circumstance in the letter of April 8th, or in the conference, of a later date, and that, on April 26th, the president of the company should have expressed a willingness to make a speedy settlement of the account for putting up the kilns, provided the matter of the Iberia Company should be settled.

In fact, we search the record in vain for any demand upon the plaintiffs with regard to the kilns in question (save the unfounded demand for curtain doors) that has not been complied with. Upon the other hand, defendant promptly made the first payment of $2,000 called for by the contract, and made the second payment, of $2,500, in cash, when it might have given its 60-day note for the amount, or, if the contract had not been complied with up to that time, might have withheld the payment entirely, and we are inclined to think that this litigation would not have arisen but for the confusing of the business transactions of one corporation with those of another.

For the reasons thus assigned, the judgment appealed from (whereby the plaintiffs are awarded the amount claimed by them, and the demand of the defendant is rejected) is affirmed, at the cost of the defendant and appellant.